**No. 59105.**—Kittay & Blitz, Inc. *v.* United States, protest 212913–K (New York).

WILSON, Judge:   The merchandise in the case at bar consists of certain opaque glass stones of different sizes and shapes, invoiced under item Nos. 6151 and 6152, covered by entry No. 974602.   It was assessed with duty by the collector at the rate of 50 per centum ad valorem under the provisions of paragraph 218 (f) of the Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, T. D. 51802, made effective by the President's proclamation, T. D. 51898, for "* * * all articles of every description not specially provided for, composed

wholly or in chief value of glass * * * or colored * * *: Other, 50¢ on each article or utensil, but not less than 30% nor more than 50% ad val."

Plaintiff claims the involved merchandise properly dutiable under paragraph 1528 of the said act, as amended, *supra*, and/or as amended by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, made effective by the President's proclamation in T. D. 52836, at the rate of 10 per centum ad valorem as imitation semiprecious stones, faceted.

The stones included under item No. 6151 are "pearshape" and are invoiced in three different sizes. Samples of all three sizes, taken from the shipment under consideration, were received in evidence as plaintiff's collective exhibit 1 (R. 11). Item No. 6152 covers "navette" (Funk & Wagnalls, 1942, defines "navette" as "an incense-boat") shaped stones, invoiced in two sizes. Samples of both sizes of this item, likewise taken from the involved importation, were received in evidence as plaintiff's collective exhibit 2 (R. 12).

Plaintiff further introduced in evidence a number of samples as representative of genuine white onyx stones, of which the imported stones are claimed imitations. Plaintiff's illustrative exhibit 3 is a "grayish white" onyx stone; illustrative exhibit 4, a "medium white" real onyx or agate stone; and collective illustrative exhibit 5, samples of real onyx or agate stones that are "very light" white in color (R. 22, 26). Two of the stones in the latter exhibit are "pearshape" and "navette" shaped, as are the imported stones, and were made up by the importer herein for purposes of comparison between the genuine white onyx stones and the imported items.

It is the contention of the plaintiff that the imported stones imitate the semiprecious stones known as white onyx or white agate. Defendant, conceding that white onyx and white agate are recognized as semiprecious stones (R. 4), contends, however, that these glass stones are not imitations of the semiprecious white onyx stones and, further, that they are not faceted.

Four witnesses were called by the plaintiff. The first, Saul Blitz, president of the plaintiff corporation, importer of precious and semiprecious stones and imitations thereof, testified that he did all the purchasing for his company abroad at wholesale and did the greater part of the selling of such importations to the American trade. He stated that, in such capacity, he had handled precious and semiprecious stones and imitation precious and imitation semiprecious stones and that he had been familiar with white onyx and white agate over a period of 27 years, having personally imported them and purchased them from other importers, as well as having seen them produced (R. 6, 13–15). In the opinion of the witness, the terms "white onyx" and "white agate" refer to the same thing.

Describing the nature and production of white onyx, plaintiff's witness testified that the source material is a form of quartz, which is known as chalcedony. Mr. Blitz stated "This chalcedony comes in various layers or bands of distinct colors. These layers or bands are separated, cut apart, and the white part would be known as white onyx or white agate." The so-called white layer is sawed or cut out of the particular mass and, from that layer, the stones known as white onyx or white agate are produced (R. 18). In the natural so-called chalcedony, the different layers of white vary in shades, the white layers being found in colors running from "light white" to "medium white" to "grayish white," so that the individual white onyx or white agate stones cut from different layers vary in shades of whiteness (R. 19)— "a stone cut from a grayish white layer would be a uniform grayish white color throughout * * * a medium white layer would be medium white throughout * * * and a light white layer would be a light white color throughout" (R. 20). The witness described illustrative exhibit 3 as "grayish white," illustrative exhibit 4 as "medium white," and the onyx stones in collective illustrative 5 as "very light white."

Testifying as to the production of the imported stones, Mr. Blitz explained as follows: The stones are made of a common glass, i. e., one which contains no lead of any kind. The glass comes in rods which are heated. After heating, the material is put into a metal mold having two parts, top and bottom, in one part of which there are a number of "faces" cut into the mold in order to bring out the cuts or the facets on the stones. The material is then pressed in the mold, automatically making the facets, and molding stones of the desired shape, size, and form. When the stones come out of the mold, there are surplus pieces of glass on them. They are then put into a barrel containing water and chemicals. This container is moved back and forth by electrical power to about an 80- to 85-degree angle. This operation washes away any surplus pieces of glass and, at the same time, polishes the stones. When the stones are removed from the barrel, they are in the polished form of the specimens in collective exhibits 1 and 2 (R. 27–28).

Mr. Blitz described the imported stones as "faceted"—"they are faceted on the bottom of the stones"—(R. 29) and stated that the washing process to which they were subjected did not affect the faceting to any substantial degree but that the facets appearing on the imported stones as they came from the barrels were like those originally present in the mold (R. 64); that, in making an imitation of an opaque stone, such as onyx, unlike the production of transparent stones in which brilliance is desired, glass containing lead generally is not used, because glass without lead serves a better purpose inasmuch as it is harder, which gives the stone a better luster (R. 29–30).

Mr. Blitz pointed out five characteristics of the real onyx stones in collective illustrative exhibit 5 which make them desirable or suitable for use in the jewelry industry, viz: (1) They are inexpensive semiprecious stones; (2) are of an evenly white color; (3) are "definitely opaque"; (4) have a good luster; and (5) are sufficiently hard to give them a very good polishing finish. He then stated that the stones represented by collective exhibits 1 and 2 have all the characteristics possessed by natural white onyx stones, as enumerated above (R. 30–31). He characterized the color of the imported stones as a "perfect match" for the semiprecious agate white onyx and stated that they are a very good imitation of the "very light" white real onyx or agate stones. Mr. Blitz also testified that stones, such as those imported, are used in the general line of jewelry, such as earrings, brooches, bracelets, for ornamental jewelry purposes. When so used, the same effect is obtained as results from the use of real light white onyx, such as represented in collective illustrative exhibit 5. In the opinion of the witness, any opaque white highly polished or shiny stone would imitate white onyx or white agate, regardless of its shape (R. 31–32).

The cross-examination of plaintiff's witness, Blitz, did not result in any contradiction of his direct testimony in any material respect. He testified that some genuine agate is pure white, i. e., as in collective illustrative exhibit 5; that it is not a fact that it is characteristic of white agate, that it is not pure white, but has wavy streaks; that genuine white agate is not usually oval, but is cut in all shapes; that he had seen genuine white onyx in all colors, including an ivory tinge, but that not all genuine white onyx has an ivory tinge (R. 32–34).

Plaintiff's witness was queried about a number of dictionary definitions of the words "agate" and "onyx." He agreed generally with the definitions of the terms, as they appear in Webster's New International Dictionary, second edition, 1936, but expressed some reservations. (A sample piece of crude chalcedony, with a distinct white layer of white agate in it, was received in evidence as plaintiff's illustrative exhibit 6 (R. 62).)

As to the various shades of white in a "white onyx" stone, the witness explained that, as a practical matter, it is customary when a person desires a white agate

(white onyx) to ask for agate (white onyx), and the seller then submits the nearest color to it that he has; that it can be pure white, grayish white, or medium white, stating that these are expressions used by him to distinguish between the various shades of white in which the genuine onyx exists. "Each band of agate is standard. Whatever band is cut out in that particular color has the color of that band" (R. 47–50).

Plaintiff's second witness, Dr. Frederick H. Pough, was exceptionally well qualified in the field of mineralogy. He holds a Ph. D. degree from Harvard and, for 17 years, had been curator of physical geology and mineralogy at the American Museum of Natural History, in charge of its mineral and gem collection. He has also written a number of books on the subject and, when this case was tried, was engaged as a consulting mineralogist "with considerable activity in the gem field" (R. 71). In the course of his work, he had become familiar with white onyx and white agate, which, in his opinion, are synonymous terms. He corroborated the testimony of plaintiff's first witness in all material respects, particularly as to the manner of obtaining the individual white onyx or white agate from the white layers of the natural chalcedony, and agreed with the conclusion of the previous witness that the individual layers are conspicuously uniform in color, so there would be no bandings in them, as opposed to the type of so-called banded agate (plaintiff's illustrative exhibit 8).

Dr. Pough stated that natural white onyx or white agate varies in shades of whiteness in which it appears naturally (R. 74–77)—"Practically the entire range of white and off shades of white" being found, as exemplified in illustrative exhibits 3 and 4 and collective illustrative exhibit 5 (R. 77). He also corroborated the testimony of the witness Blitz that the imported stones possess the material characterittics of the genuine stones. While plaintiff's witness, Pough, stated that white onyx and white agate do not have extensive use in the jewelry industry, he did testify, however, that their chief use is as layers for cameos and "purposes of that sort" (R. 88).

On the question as to whether the imported stones are faceted, the witness testified as follows (R. 133):

Q. Will you please examine collective exhibits 1 and 2, and state what the facets accomplish on those, if anything?—A. The effect of facets on those is the same as the effect of facets on any faceted opaque stone. While the total amount of light reflected from the surface of a polished surface is the same, the effect upon the observer is of greater brilliance because the large reflection surfaces formed by the facet make more intense flashes of light all at one time. Consequently they give the impression of greater brilliance.

Q. So it is the effect produced by the facets? There is in fact no increase in the brilliance itself, but the effect produced by the faceting?—A. In an opaque stone it is the effect.

In the above respect, previous testimony that the facets on the imported stones give them the appearance of having greater brilliance (R. 120) was also confirmed.

Robert L. Dreher, connected with Dreher Brothers & Wider, importer of semi-precious and synthetic stones, called by the plaintiff, testified that, for the past 15 years, in the course of his business, he had personally purchased abroad, and had sold at wholesale in the United States, white onyx or white agate stones. In his opinion, plaintiff's exhibits 3, 4, and 5 are representative of the white onyx or white agate stones, with which he had become familiar in the trade. He further stated that the shades of white in those samples are the shades commonly found in white agate or white onyx and, specifically, that the "navette" and "pear-shaped" stones in collective illustrative exhibit 5 are of the same color as the imported stones. The witness also confirmed the previous testimony that the imported stones, collective exhibits 1 and 2, possess the characteristics of the real

stones, as represented by exhibits 3, 4, and 5, particularly as to luster and color (R. 96–97).

Plaintiff's last witness, George Heller, was associated as partner with Heller Hope Co., dealer in synthetic and semiprecious stones. He had purchased such merchandise abroad and had sold it at wholesale to the domestic trade. He testified that he had handled all types of agate and had personally bought and sold the so-called white onyx or white agate (R. 104). He, like the previous witnesses, stated that the characteristics of illustrative exhibits 3 and 4 and collective illustrative exhibit 5 which made them desirable or suitable for use as semiprecious stones are their hardness, luster, uniformity of color, and their desirability to purchasers. Of the imported stones (collective exhibits 1 and 2), the witness stated that "To the eye they would appear to contain all of the same characteristics as the white onyx," with the exception of the difference in their hardness (R. 105).

On the question of "faceting," the witness stated that there are facets on one side of the imported stones; that the imported stones "could be" bufftop stones but that "It is the ultimate use that it is put to that would be the determining factor in telling what kind of a stone it was" (R. 114). He then stated that in the case of a bufftop stone, and where the faces or cuts are on the underside, those faces or cuts very definitely increase the brilliance of the stone, even if it is an opaque stone.

Plaintiff's witness, Blitz, recalled to the stand by counsel for the defendant, testified that the imported stones are buffed on one side and that they are faceted on the other; that whether they are "bufftop" stones, or whether stones are buffed on the bottom, depends upon which is the top or bottom, according to the use to which they are put. He stated that the stones here imported were ordered as "faceted" stones.

Defendant introduced in evidence a brooch containing eight white opaque stones, similar to the imported stones (R. 65), which are set "bufftop up" (defendant's illustrative exhibit A) (R. 67). This article originally contained nine stones, but one is missing in this particular exhibit. The stones are in settings with closed backs, and it does not appear whether or not the stones have been cut or faceted in any manner. As to this exhibit, plaintiff's witness, Blitz, testified that such stones are also set a great many times with the buff on the bottom and the facet showing (R. 120).

Defendant then called Pincus Jacobs, foreign buyer for Coro, Inc., importer of "finished goods, imitation stones," and "loose beads," which firm had manufactured defendant's exhibit A. The brooch had been manufactured in this country, and the stones were set therein after the metal had been finished. The witness stated that this article had facets in the bottom of the stone, describing the stones therein as "bufftop with faceted back." He had personally purchased merchandise, such as the imported stones, and had likewise seen them manufactured, agreeing that they were produced in the manner as testified to by plaintiff's witness. In the opinion of Mr. Jacobs, the stones in defendant's exhibit A are substantially similar in color and luster to the imported stones (R. 126). Significantly, this witness was not asked nor did he testify as to whether the imported stones were or were not imitations of the genuine white onyx.

On cross-examination, this witness agreed that the setting of the stones, as they appear in defendant's exhibit A, was not the only type of setting in which they could be placed but that they could be used in the jewelry industry in a particular type of earring which had "open" settings and also in a necklace form of setting

which had openwork places to hold the stones. He admitted that, in such cases, it would be possible to see the faceting set in front (R. 131–132).

The testimony of plaintiff's witnesses in this case, which has not been essentially controverted by evidence adduced on defendant's behalf, establishes that the imported stones, plaintiff's collective exhibits 1 and 2, possess in a substantial degree those qualities of the genuine white onyx which make them suitable for use in the manufacture of jewelry, namely: Uniformity of color, luster, opacity, desirability, and sufficient hardness for use as imitations. They thus resemble the genuine white onyx, concededly a semiprecious stone, and are, therefore, imitations of semiprecious stones.

Further, the record herein supports the plaintiff's claim that the imported stones are faceted. The defendant's witness, Jacobs, agreed that the stones at bar are faceted on the bottom. The defendant contends, however, that in the case of an opaque stone where the faceting is on the bottom of the stone, such a stone would not be faceted. The testimony of plaintiff's witnesses, however, is to the effect that such a stone would be faceted. Be that as it may, merchandise is classifiable in its condition, as imported, and examination of the stones here in question show them to be faceted within the common acceptation of the term.

Our determination that the imported stones are imitations of genuine white onyx stones is confirmed, in our opinion, by an examination of the representative samples, which in classification cases are often potent witnesses. Cf. *United States* v. *Bernard, Judae & Co.*, 18 C. C. P. A. (Customs) 68, T. D. 44029. To one not an expert, it would be difficult to distinguish between the imported stones and the genuine white onyx stones, it appearing that the stones at bar possess, to a substantial degree, the color, luster, and opacity of the genuine stones and are of sufficient hardness to imitate the genuine articles.

Counsel for the defendant, in support of the contention that the imported stones are not imitations of semiprecious stones, directs our attention to *Eitinger Bead Co.* v. *United States*, 13 Cust. Ct. 50, C. D. 867, wherein certain beads were held not dutiable as beads in imitation of semiprecious stones. The holding in that case, however, was based on a different record from that which now confronts us. In that case, the beads in question did not resemble even closely in color the precious or semiprecious stones which it was contended they imitated. Here, there is usually close resemblance in characteristic qualities of the imported stones to the genuine white onyx stones. The *Eitinger* case, *supra*, is not helpful or controlling in the determination of the classification of the merchandise at bar.

The latest expression of our appellate court as to what constitutes an imitation of semiprecious stones was had in the case of *United States* v. *G. Klein & Son*, 42 C. C. P. A. (Customs) 73, C. A. D. 574. The merchandise there involved consisted of certain shiny black glass beads and dull black glass beads, which were classified as beads in imitation of semiprecious stones and which were claimed properly dutiable as beads, not specially provided for, under the relevant provisions of paragraph 1503 of the Tariff Act of 1930. The trial court sustained the protest, *G. Klein & Son* v. *United States*, 31 Cust. Ct. 335, Abstract 57678, finding, in effect, that the beads there imported did not resemble the genuine article in either texture, cutting or faceting, uniformity of color, or manner of construction. In its decision, this court stated:

> The only phase of defendant's testimony that lends support to the collector's classification appears in the consistent statement of the three witnesses who appeared on behalf of the Government that the color of the beads under consideration is the same as black onyx.

Our appellate court, however, reversed the lower court and sustained the classification made by the collector. In so doing, it stated:

Both the imported shiny black beads and the genuine shiny black onyx are lustrous and opaque. These beads are of the same color, and to all outward appearances, generally of the same texture. Both the imported dull beads and the specimen of dull onyx are black, opaque, have a mat surface, and to all outward appearances have the same texture. In the light of the foregoing analysis of the statute, we feel that the importer did not sustain his burden of proving that both types of imported beads are not in imitation of black onyx.

The principles enunciated in the *Klein* case, *supra*, are applicable with equal force to the circumstances herein and, in our opinion, are controlling in the case at bar. On the record here presented, we find that the plaintiff has established that the imported stones are imitations of semiprecious stones, faceted.

Defendant argues in its brief that the imported articles cannot be held to be imitations of semiprecious white onyx stones because the importer has failed to establish the existence, prior to the importation of the stones here in question, of genuine white onyx stones in the form of those imported and also that plaintiff has failed to show a commercial market for stones like those imported. Counsel for the Government, adverting to testimony herein that the supply of real white onyx is so limited that it does not have great use in the jewelry industry, maintains, in effect, that the scarcity of the real material should defeat the claimed classification. In our opinion, this contention of the defendant is untenable. In the *Klein* case. *supra*, the record indicated that genuine onyx beads, having an oblong shape such as the dull glass beads there under consideration, were "extremely scarce." Nevertheless, the beads there imported were held in imitation of semiprecious stones.

For the aforesaid reasons, we hold the merchandise in question, represented by invoice item Nos. 6151 and 6152, covered by entry No. 974602, properly dutiable under paragraph 1528 of the Tariff Act of 1930, as amended by the pertinent trade agreement, at the rate of 10 per centum ad valorem as imitation semiprecious stones, faceted, as claimed. The protest covering merchandise under entry No. 704077, having been abandoned, is hereby dismissed.

The protest is sustained to the extent indicated. Judgment will issue accordingly.